IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

PRISM TECHNOLOGIES, LLC,      )
                              )
            Plaintiff,        )           8:10CV220
                              )
       v.                     )
                              )
ADOBE SYSTEMS, INCORPORATED,  )       MEMORANDUM AND ORDER
AUTODESK, INC., McAFEE, INC., )
NATIONAL INSTRUMENTS          )
CORPORATION, SAGE SOFTWARE,   )
INC., SYMANTEC CORPORATION,   )
and TREND MICRO INCORPORATED, )
                              )
            Defendants.       )
_____)

This matter is before the Court to construe patent
claim terms pursuant to *Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996).  Plaintiff Prism Technologies, LLC ("Prism")
has alleged infringement of its patent, United States Patent No.
7,290,288 ("'288 Patent", Ex. 1, Filing No. 1), by defendants
Adobe Systems, Incorporated, Autodesk, Inc., McAfee, Inc.,
National Instruments Corporation, Sage Software, Inc., Symantec
Corp., and Trend Micro, Incorporated (collectively,
"Defendants").

**I.  Background and Procedural History.**

The '288 Patent, entitled "Method and System for
Controlling Access, by an Authentication Server, to Protected
Computer Resources Provided via an Internet Protocol Network,"
issued on October 30, 2007, from an application filed August 29,

2002.  Prism contends that the '288 Patent is a continuation-in-part of another Prism patent, U.S. Patent No. 6,516,416 ("'416 Patent"), entitled "Subscription Access System for Use with an Untrusted Network," which issued on February 4, 2003, from an application filed June 11, 1997 (Ex. 6, Filing No. 179).

The claims of the '416 Patent include several of the same terms whose construction is presently disputed in the '288 Patent.  In previous litigation initiated in 2005 by Prism against other defendants (the "Delaware Case"), the United States District Court for the District of Delaware (the "Delaware Court") construed the term "hardware key" in the context of the '416 Patent to mean "external hardware device or object from which the predetermined digital identification can be read" (*Prism Tech. LLC v. Verisign, Inc.*, No. 05-214-JJF, Filing No. 449 (D. Del. Apr. 2, 2007), Ex. 6, Filing No. 173, at 3 (the "Delaware Order")).  *See also Prism Tech. LLC v. Verisign, Inc.*, No. 05-214-JJF, Filing No. 448 (D. Del. Apr. 2, 2007) (the "Delaware Memorandum").  The district court in the Delaware Case also construed other terms in the '416 Patent that are common to the '288 Patent.

Prism appealed the Delaware Order, which the Federal Circuit affirmed without comment.  *Prism Tech. LLC v. Verisign, Inc.*, 263 F. App'x 878 (Fed. Cir. 2008).  However, Prism did not appeal all of the claim constructions of the Delaware Order, and

-2-

the constructions that it did appeal are not at issue in this case.

On April 6, 2007, Prism disclosed the Delaware Memorandum and the Delaware Order to the U.S. Patent and Trademark Office ("PTO") in connection with Prism's then pending application for the '288 Patent (Information Disclosure Statement, Ex. 17, Filing No. 173, at 3, 16).

Prism filed its complaint in the present action on June 8, 2010 (Filing No. 1). The Court held a planning conference on November 30, 2010. At that time, the parties disputed the meaning of several of the claim terms in the '288 Patent, but it was thought possible that the Court's construction of "hardware key"[1] might be dispositive of the case, making it unnecessary to construe the other disputed terms.

On April 11, 2011, the Court conducted the initial *Markman* hearing for the purpose of construing "hardware key." Subsequently, this Court construed "**hardware key**" to mean:

> **An external hardware device or object from which the predetermined digital identification can be read.**

(Filing No. 188, at 2). This construction is identical to the construction given in the Delaware Case.

---

[1] The parties agree that "hardware key" and "access key" have the same meaning within the context of the '288 Patent. For ease of reference, the Court hereafter will refer only to "hardware key."

-3-

After another hearing with the parties on July 21, 2011, it was determined that the construction of "hardware key" did not dispose of the issues in the case and that other terms in the '288 Patent were still disputed. After the parties submitted claim construction briefs, the Court conducted a second *Markman* hearing on January 12, 2012, for the purpose of construing the additional disputed terms.

On January 20, 2012, after the second *Markman* hearing, the parties submitted a joint stipulation on claim construction, including an agreement as to the significance of claim preambles and as to the definitions of five claim terms (Filing No. 440). The Court will adopt the jointly stipulated agreement regarding the significance of the preambles and the construction of the five terms. The Court construes the eight remaining disputed terms as indicated herein.

## II.  Standard of Review.

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In construing a claim term, the court must give each term its "ordinary and customary meaning, as [it] would be understood by one of ordinary skill in the art in question at

-4-

the time of the invention." *Intervet Inc. v. Merial Ltd.*, 617
F.3d 1282, 1287 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at
1312-13).

"Because the meaning of a claim term as understood by
persons of skill in the art is often not immediately apparent,
and because patentees frequently use terms idiosyncratically, the
court looks to 'those sources available to the public that show
what a person of skill in the art would have understood disputed
claim language to mean.'" *Phillips*, 415 F.3d at 1314 (quoting
*Innova/Pure Water,* 381 F.3d at 1116). "Sources available to the
public" include:  (1) the patent claims' words; (2) the remainder
of the patent's specification; (3) the patent's prosecution
history; and (4) extrinsic evidence pertaining to relevant
scientific principles, such as a technical term's meaning and the
state of the art.  *Phillips*, 415 F.3d at 1314; *Vitronics Corp. v.
Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

"First, we look to the words of the claims themselves,
both asserted and nonasserted, to define the scope of the
patented invention." *Vitronics*, 90 F.3d at 1582.  "The written
description part of the specification itself does not delimit the
right to exclude.  That is the function and purpose of claims."
*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed.
Cir. 1995) *aff'd*, 517 U.S. 370 (1996).

Because claim terms are typically used consistently throughout a patent, a term's usage in one claim can provide insight to the meaning of the same term in another claim. *Phillips*, 415 F.3d at 1314*.*  In addition, when "patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."  *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).  "[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003)

In addition to the language of the claims, the patent specification "'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  However, "[t]he longstanding difficulty is the contrasting nature of the axioms that (a) a claim must be read in view of the specification and (b) a court may not read a limitation into a claim from the specification."  *Innova,* 381 F.3d at 1117.  "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."  *Phillips*, 415 F.3d at 1323.

-6-

"The court has broad power to look as a matter of law to the prosecution history of the patent in order to ascertain the true meaning of language used in the patent claims . . . ." *Markman,* 52 F.3d at 980. "This history contains the complete record of all the proceedings before the [PTO], including any express representations made by the applicant regarding the scope of the claims. As such, the record before the [PTO] is often of critical significance in determining the meaning of the claims." *Vitronics*, 90 F.3d at 1582.

## III. Claim Construction.

The parties offer differing proposed constructions for the following terms. In arriving at a construction of each term, the Court looks first to the language of the claims themselves in the '288 Patent; second, to the specification of the '288 Patent; third, to the prosecution history, if applicable; and, finally, to relevant extrinsic evidence, if any.

### A. "digital identification"

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "digital data whose value is known in advance or calculated at the moment" | "digital data that uniquely identifies the account holder to whom the hardware key (or access key) is issued" |

Prism argues that its proposed construction of "digital identification" is correct because it is identical to the

Delaware district court's construction of the same term in the
'416 Patent.  Prism also contends that its proposed construction
is consistent with the '288 Patent's other intrinsic evidence.
For example, none of the claims that include the term "digital
identification" refers to an "account holder."

Meanwhile, Defendants point out that several
embodiments listed in the '288 Patent specification identify an
"account holder" who uses a hardware key that contains digital
identification.  However, Prism alleges that not all embodiments
in the specification include such a description of an account
holder.  Prism argues that the claims must not be restricted by
an embodiment listed in the specification when the embodiment "is
by no means the only way in which the invention can be practiced"
(Filing No. 309, at 25).

Because some of the terms presently disputed were
construed in the Delaware Case in the context of the parent '416
Patent, the Delaware Court's constructions are directly relevant.
*NTP, Inc.*, 418 F.3d at 1293.  The Delaware district court
construed the term "predetermined digital identification" exactly
as Prism now proposes for the term "digital identification."
(Delaware Order, at 2).  Yet, Defendants quote Prism's
descriptions of the '416 Patent, based on its specification, to
support their contention that Prism itself previously argued to
the Delaware Court that digital identification must uniquely

-8-

identify an account holder (or user).  But Defendants' quotations would appear to support Prism's contention that the digital identification need not identify an account holder, but is a more general term that could also identify a machine or a device: "The hardware key's main function is to uniquely identify a user (and/or a device) . . ." (Filing No. 370, at 19, quoting Ex. 8, Filing No. 371, at 34).

The prosecution history also supports Prism's definition of "digital identification."  During the prosecution of the '288 Patent, Prism provided the PTO with copies of the Delaware Memorandum and the Delaware Order, making those items part of the '288 Patent's prosecution history and making those items available to a person of skill in the art in question.

Notably, the defendants in the Delaware Case (none of whom are Defendants here) had proposed the following construction for "predetermined digital information:"  "A data string that is preassigned and unique to the hardware key and that cannot be shared with other users" (Ex. 7, Filing No. 310, at 21).  This construction, which the Delaware Court rejected, also included the limiting concept of uniqueness, as Defendants here propose.

Defendants also argue that the Delaware Memorandum does not address the Delaware Court's construction per se, because "[t]he dispute between the parties in [the Delaware Case] concerning the digital identification was whether it had to be

-9-

'known in advance' (the Defendants' position) or whether it could
also be 'calculated at the moment' (Prism's position)" (Filing
No. 370, at 23-24).  Thus, Defendants aver that Prism cannot
reasonably claim that "'the issue of whether the term 'digital
identification' includes the requirement of 'uniquely
identifying' a specific user was previously considered and
rejected by the Delaware Court'" (Filing No. 370, at 21, quoting
Filing No. 309, at 22).  While the Delaware Court may not have
elaborated on the theory behind its claim construction of
"digital identification," the fact remains that it rejected the
Delaware defendants' construction (which included the word
"unique") in favor of Prism's construction (which did not).

     As this Court noted in its previous claim construction
order regarding the term "hardware key," "given that the '288
Patent and '416 Patent are related patents sharing identical
terms, the Delaware district court's . . . construction of
'hardware key' lends substantial support to making an identical
construction in this case" (Filing No. 188, at 14).  The argument
remains the same for the term "digital identification."  In
addition, because "hardware key" was construed in the '416 Patent
to include a "predetermined" digital identification, the
prosecution history of the '288 Patent supports a conclusion that
the construction of "digital identification" should have the same
construction as "predetermined digital identification" for the

-10-

'416 Patent.  The Court construes **"digital identification"** to mean **"digital data whose value is known in advance or calculated at the moment."**

   B.   **"identity data"** terms

| Prism's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|
| **"identity data"**:  "data sufficient for the system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access protected resources" | **"identity data"**:  Defendants believe that the Court should not construe the term "identity data" in isolation, but rather in the context of the relevant claim language. |
| **"identity data of [the] client computer device"**:  In light of the proposed construction for "identity data," Prism does not believe that the phrase "identity data of [the] client computer device" needs to be separately construed. | **"identity data of [the] client computer device"**:  "data, including the digital identification as well as some additional data (e.g., a username and/or a password) that uniquely identifies the account holder using the client computer device" |

   The Delaware Court construed the term "'Identity Data' as it relates to the Subscriber Client Computer" in the '416 Patent to mean "data sufficient for the patented system to determine whether a person, organization, and/or computer is authentic and/or is entitle[d] to a[cc]ess said selected computer resources" (Delaware Order at 3).  Prism "proposes that the Delaware construction . . . be adopted for the asserted claims of the '288 Patent as well, with only slight modification so that

the construction comports with the language of the '288 claims (which refer to 'protected resources' rather than 'selected computer resources')" (Filing No. 309, at 26).  Prism proposes a construction of the term "identity data" only, because that term occurs in some of the other claims without being associated with a "client computer device" (Filing No. 309, at 27).

Prism objects to Defendants' proposed construction because it states that "additional data (e.g., a username and/or a password)" is part of the identity data, in addition to the digital identification, which Prism states is not required by claim 1.  However, Prism notes that "at least one of a username and a password" is included in claim 3, which is dependent on and differentiates claim 1 (Filing No. 309, at 27-28).

As with the term "digital identification" above, the Court will not import the terms "account holder" and "uniquely" into the claim construction for "identity data."  In addition, the Court declines to construe "identity data of [the] client computer device," because a construction of the term "identity data" will serve to construe the other phrases in which it appears.  For the same reasons stated above with regard to "digital identification," the Court adopts substantially the same construction as construed in the Delaware Order.  The Court construes **"identity data"** to mean **"data sufficient for the system to determine whether a person, organization, and/or**

**computer is authentic and/or is entitled to access protected**

**resources."**

C.  **"authenticating"** terms

| Prism's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|
| **"authenticating"**: "determining that something is, in fact, what it purports to be"<br><br>**Other "authenticating" terms:** In light of the proposed constructions for "authenticating," "digital identification," and "identity data," Prism does not believe that the other phrases where "authenticating" appears need to be separately construed. | **"authenticating"**:  Defendants believe that the Court should not construe the word "authenticating" in isolation, but rather in the context of the relevant claim language, as set forth below.<br><br>**"authenticating [] the identity of [the/said] client computer device"**:  "to determine whether the received identity data, including the digital identification, for the account holder matches the identity data for the account holder stored on the clearinghouse"<br><br>**"to authenticate [said/...the] digital identification"**: "to determine whether the received digital identification for the account holder matches the digital identification for the account holder stored on the authentication server"<br><br>**"[to] authenticat[e][ing] [said/...the] identity data [of the access server]"**: "to determine whether the received identity data for the access server matches the identity data for the access server stored on the authentication server" |

-13-

The term "authenticate" was construed in the Delaware Case to mean "determine that something is, in fact, what it purports to be" (Delaware Order, at 6). However, unlike "digital identification" and "identity data," for the term "authenticate," the Delaware Court accepted the joint stipulation of the parties as to the construction and did not discuss the construction beyond the fact of the stipulation (Delaware Memorandum, at 10).

As a result, Defendants state that "the Delaware court's adoption of a construction for the word "authenticating" is irrelevant because the parties **agreed** to that construction, and the Delaware court adopted the parties' agreement without discussing the merits of the construction. . . . Moreover, the basis of and rationale behind the [Delaware] parties' agreement is unknown" (Filing No. 370, at 33). Defendants do not cite any case law to support this divergence from the general rule that claims from related patents are interpreted consistently. *NTP, Inc.*, 418 F.3d at 1293. This Court notes that regardless of whether the Delaware Court specifically construed the term, the construction of the term "authenticate" is as much a part of the prosecution history of the '288 Patent as are the terms that the Delaware Court did specifically construe.

Prism urges the Court to adopt the grammatically correct counterpart of the construction in the Delaware Case for the term "authenticating." In addition, Prism urges the Court to

-14-

decline to specifically define the remaining phrases wherein "authenticating" appears. Defendants prefer a separate construction for each of the phrases where the term "authenticating" appears, without a separate construction for the term "authenticating" by itself. As with "identity data," the Court declines to separately construe each of the phrases in which the word "authenticating" appears.

Prism objects to Defendants' proposed construction for two reasons. First of all, Prism states that Defendants "seek to improperly import the specification's language of identifying 'account holders' into the claims, when the claims on their face clearly do not mention anything about 'account holders'" (Filing No. 309, at 32). Defendants claim that their proposed construction is supported by the specification of the '288 Patent. Defendants claim that "the specification explains, '[t]he reader converts the biometric into a digital identification that is **stored** in a local repository for **comparison** during **authentication**'" (Filing No. 370, at 34, quoting '288 Patent 22:7-9). However, Defendants' quote from the specification does not include an "account holder" or a "match."

Defendants also quote the specification as to the inventor's intent, where the words "account holders" appear, namely, "'[t]he **present invention** implements its platform by restricting transaction services to only **authenticated** and

-15-

authorized **account holders** . . .'" (Filing No. 370, at 35,
quoting '288 Patent 3:49-51).  Prism claims that this quotation
describes but one embodiment of the invention and that other
aspects of the specification support Prism's contention that the
concept of an "account holder" is not a necessary part of the
construction of the term "authenticating."  To wit, Prism cites
the "Summary of the Invention," where the invention is described
in terms that do not include an "account holder:"

> **The present invention** discloses a
> system for securing and tracking
> usage of transaction services or
> computer resources by a client
> computer from a first server
> computer, which includes
> clearinghouse means . . . the
> clearinghouse means being adapted
> to **authenticate the identity of the
> client computer** responsive to a
> request for selected services or
> resources of the first server
> computer; . . .

(Filing No. 400, at 26, quoting '288 Patent 1:52-55, 1:67-2:3).

In addition, Prism objects to the use of the word
"match" as "unduly restrictive" because "it requires the system
to determine whether the digital identification has perfect
correspondence to a digital identification stored in the
clearinghouse or authentication server" (Filing No. 309, at 32).
Prism states that authentication can occur in other ways, such as
with an intermediary step of the use of encrypted data (Filing

No. 309, at 32-33, citing '288 Patent 18:46-66); Defendants find the encryption step irrelevant to the argument.

Prism states that its proposed construction is supported by extrinsic evidence in the form of the IEEE Standard Dictionary of Electrical and Electronics Terms, which defines "authentication" as "'[t]he process of validating a user or process to verify that the user or process is not a counterfeit'" (Filing No. 309, at 31, quoting IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed. 1996)). Prism concludes that its proposed construction "comports with the ordinary meaning of the term as it is used in the computer industry" (Filing No. 309, at 31). Defendants cite two other technical dictionaries for definitions that are more conducive to the acceptance of their proposed construction; Prism objects to Defendants' dictionaries as being overly narrow.

After review of the parties' submissions, the Court finds that it has not been "otherwise compelled" to veer from the presumption that "the same claim term in the same patent or related patents carries the same construed meaning." *Omega Eng'g, Inc.*, 334 F.3d at 1334. The Court finds that the intrinsic evidence justifies the adoption of Prism's proposed construction. Accordingly, the Court construes **"authenticating"** to mean **"determining that something is, in fact, what it purports to be."**

-17-

D.   "clearinghouse"

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "a computer having software capable of storing data and controlling access to protected resources" | "a computer that, independently of the server computer, authenticates account holders and controls access to protected resources of the server computer" |

The term "clearinghouse" was not construed in the Delaware Case.  The parties agree that the clearinghouse controls "access to protected resources."  However, the parties' proposed constructions have two major differences.

First, Defendants' construction proposes that the clearinghouse is independent of the server computer.  In contrast, Prism claims that the clearinghouse is only independent in certain embodiments, such as that delineated in claim 6, which reads as follows:  "The system of claim **1**, wherein said at least one clearinghouse operates as an independent entity and authenticates multiple server computers capable of being at separate physical locations."  '288 Patent at 35:49-52.  Prism states, "The presence of the additional limitation in claim 6 that the clearinghouse 'operates as an independent entity' creates a presumption that this limitation is not a part of claim 1, from which claim 6 depends" (Filing No. 309, at 38, citing *Phillips*, 415 F.3d at 1315).

-18-

Defendants point out that Prism's claim construction presumption "will be overcome by a contrary construction dictated by the written description or prosecution history." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). First, Defendants cite Prism's own depiction of its invention, produced on page 10 of Prism's slide deck for its Power Point presentation during the 2012 *Markman* hearing, which clearly shows that the clearinghouse resides on a separate physical computer from the server computer. In addition, Defendants claim that Prism made statements to the PTO during the prosecution of the '288 Patent, intending to distinguish the '288 Patent from prior art "Tabuki," whereby Prism established that the clearinghouse must act independently from the server computer (Filing No. 370, at 40; *see* Ex. 14, Filing No. 371, Ex. 15, Filing No. 371, at 41). Defendants claim that Prism's statements constitute a "clear and unmistakable disavowal" of the broader construction that Prism now seeks, such that Prism has now "limit[ed] the meaning of a claim term." *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

Prism claims that the statements to the PTO were not a clear and unmistakable disavowal, because the statements do not mention a "server computer." Defendants claim that Prism's "server computer" is the same as Tabuki's "application server," as illustrated by Prism's own contentions to the PTO. For

-19-

example, Prism stated, "Tabuki does not teach a verification server [Tabuki's term] or clearinghouse [Prism's term] that performs user authentication independently from the application server as claimed by [Prism]" (Ex. 14, Filing No. 371, at 27). This implies that Prism is claiming that its invention teaches a clearinghouse that performs authentication independently from its application server; i.e., the application server is the same entity as the server computer.

In addition, Prism stated to the PTO that "[Prism's] claimed application server and clearinghouse function in a fundamentally different way from the application server and verification server of Tabuki.  The challenge of [Prism's] application server to the clearinghouse is: ***Can this user or account holder have access to my selected resources?***"  *Id.* Again, this statement establishes that Prism's server computer must be the same as Tabuki's application server.  The Court finds that Defendants have effectively established that Prism clearly and unmistakably disavowed a broader construction that would have allowed the clearinghouse to exist not necessarily independently of the server computer.

The second difference in the parties' proposed constructions is that Defendants claim that the clearinghouse construction must indicate that the clearinghouse also "authenticates account holders."  In response, Prism maintains

-20-

that the language of the claims themselves describes what the clearinghouse does. For example, Claim 1 states that the clearinghouse stores data of the server computer and the client computer device, not of an account holder. In addition, Prism quotes other claims using the term "clearinghouse" and concludes, "As the language of these claims makes clear, the clearinghouse performs the function of authenticating the identity of various physical devices, not 'account holders'" (Filing No. 309, at 38). Finally, Prism states that none of the asserted claims for the term "clearinghouse" references accounts or account holders.

After a review of the parties' briefs and accompanying evidence, the Court construes **"clearinghouse"** to mean **"a computer that is independent of the server computer and has software capable of storing data and controlling access to protected resources of the server computer."**

E.   "access server"

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "server software that makes available information or other resources" | "a computer that makes available information or other resources" |

"Access server" was not construed in the Delaware Case. The sole difference in the parties' proposed constructions is whether the access server is "server software" or "a computer."

Prism maintains that the access server could refer to software, rather than to a particular computer or device. Prism notes that when the inventors intended to refer to a computer in the claims, they used the word "computer," as in the term "server computer" in claims 1, 31, 62, and 87 of the '288 Patent (Filing No. 309, at 39). Prism maintains the use of the new term "access server" indicates that it is not the same thing as the server computer.

Prism also cites the language of the specification in support of this contention. Prism claims that the parties are in agreement that the term "secure transaction server 34" in the specification refers to the "access server" as recited in the claims that were added later in the prosecution history (Filing No. 400, at 30). With that understanding, Prism cites the '288 Patent specification:

> With respect to the major components of the system as shown in FIG. **1**, the transaction clearinghouse **30** preferably resides on a back office platform in a corporate network. It has a secure interface to communicate with the secure transaction servers **34**, which reside on the same machine that hosts the web server.

'288 Patent 4:14-19. Prism argues that the secure transaction server 34 (or access server) cannot be a computer, because it "resides on [a] machine." Therefore, the access server must be a software program. Prism also cites extrinsic evidence in the

-22-

form of technical dictionaries to support its thesis that the
term "server," generally speaking, could be a "computer or
program" (Ex. 9, Filing No. 310, at 9-10).

        Defendants note that claim 118 discloses, "wherein said
at least said portion of said protected computer resources are
stored on said at least one access server."  '288 Patent 45:37-
39.  Defendants argue that the access server must be a computer,
or it would not be capable of storing the protected computer
resources.  Defendants state that the access server should be
construed in the same way as "server computer" (one of the
jointly stipulated terms) because Prism substituted the term
"access server" for "server computer" in the amendment to the
'288 Patent filed on March 2, 2007, adding claims 117-187.
Defendants claim,

> In this amendment, the applicants
> substituted the term "access
> server" for "server computer" in
> its new set of claims, without
> explanation for the substitution.
> The second set of claims is based
> on the same disclosure as the
> initial set.  As a result, the
> corresponding limitations should be
> construed the same.  This is
> consistent with how the parties and
> the Court have agreed that the two
> terms "hardware key" and "access
> key" are, in fact, synonyms.

(Filing No. 370, at 46-47).  Defendants also cite a different
technical dictionary that supports their contention that a
server, in general, is a computer or a device.

-23-

After careful review of the briefs and the submitted evidence, the Court finds that Defendants have not established that the "access server" of the later claims of the '288 Patent must be the same entity as the "server computer" of the earlier claims, nor have they established that an access server must be computer hardware. The Court construes **"access server"** to mean **"server software that makes available information or other resources."**

F.    **"authentication server"**

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "software capable of storing data and permitting access to protected computer resources" | "a computer that, independently of the access server, authenticates account holders and controls access to protected computer resources of the access server" |

"Authentication server" was not construed in the Delaware Case. The parties' proposed constructions are largely aligned with the proposed constructions for the terms "clearinghouse" and "access server," in that the same issues arise here as did for those terms. For the same reasons given above for "clearinghouse" and "access server," the Court construes **"authentication server"** to mean **"server software that is independent of the access server and is capable of storing**

**data and controlling access to protected computer resources of the access server."**

> ### G.   **"selectively requiring . . . [said/the] client computer device to forward"**

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "choosing to require that the client computer device transmit certain information" | "during an operating session, periodically requiring the client computer device to forward" |

The phrase "requiring . . . to forward" was construed in the Delaware Case to mean "requiring that certain information be transmitted" (Delaware Order, at 7).  As with the term "authenticate," the Delaware Court adopted without comment the joint stipulation of the parties as to this construction.

Unlike the Delaware construction, this Court's construction must also take into account the word "selectively." Prism's proposed construction adds the concept of "choosing to require" in response to the word "selectively," whereas Defendants propose the word "periodically."  Prism states that Defendants' use of the word "periodically" implies that the transmission must happen more than once, which it says is not necessarily indicated in all of the claims.

Prism also points out that dependent claim 9 adds the limitation of "intermittently" to the act of requiring to

forward.  Since "intermittently" is a synonym of "periodically,"
Prism argues, then dependent claim 9 would not add anything to
independent claim 1 because that concept would already be
included in independent claim 1.  Defendants state that Prism's
phrase "choose to require" does not mean the same thing as
"selectively require."  Prism refutes this argument with evidence
from the prosecution history suggesting that the PTO examiner
interpreted "selectively" as differentiating from prior art where
the information was required to be forwarded "automatically," so
that introducing the concept of choice would properly account for
that distinction.

　　　　Otherwise, Prism's proposed construction tracks the
Delaware Case construction, defining the verb to "forward" as to
"transmit certain information."  Prism claims that this
translation of the word "forward" is evident from the language of
the claims themselves, because, for example, the digital
identification is transmitted from a client computer device to a
server computer.  Defendants claim that the meaning of the word
"forward" is commonly understood, and does not need to be
translated as "transmit."

　　　　Finally, Prism claims that Defendants' proposed
temporal phrase, "during an operating session," improperly
narrows the construction and is not required by the claims.
Defendants state that the phrase "during an operating session" is

-26-

important because this phrase would illustrate the fact that the "selective requiring" happens after an initial authorization of the client computer.

After review of the parties' submissions, the Court finds that the intrinsic evidence justifies the adoption of Prism's proposed construction.  Accordingly, the Court construes **"selectively requiring . . . [said/the] client computer device to forward"** to mean **"choosing to require that the client computer device transmit certain information."**

### H.   "adapted to forward"

| Prism's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| "capable of transmitting" | "configured to forward" |

The term "adapted to forward" was construed in the Delaware Case to mean "capable of transmitting" (Delaware Order, at 6).  As with the terms "authenticate" and "requiring . . . to forward," the Delaware Court adopted without comment the joint stipulation of the parties as to this construction.

Prism argues that "capable of transmitting" is an appropriate construction because there is little difference between the use of the phrase in the '288 Patent and in the parent '416 Patent.  Defendants, on the other hand, cite patent construction decisions in other cases that they claim support their construction.  First, in *Boston Scientific Corp. v. Cordis*

-27-

*Corp.*, No. C 02-01474 JW, 2006 WL 3782840 (N.D. Cal. Dec. 20, 2006), the court construed "adapted to" to mean "configured to," as opposed to "suitable for." *Boston Scientific*, at *3. In that case, after citing several common dictionaries, the court stated, "Plaintiffs' proposed definition of 'configured to' embraces the concept of a device intentionally and specifically made to act in a certain way." *Id.* at *2. On the other hand, "suitable for" was not the correct construction because it did not account for the device in question to be "intentionally and specifically made," which follows from the words "adapted to." *Id.* at *2. The court's decision was partly informed by the fact that the inventors had used the phrase "capable of" in some instances, and "adapted to" in others, implying that the two phrases must have different meanings. In any event, the court concluded that "'capable of' is a broader term than 'adapted to.'" *Id.*

Likewise, in *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366 (Fed. Cir. 2009), the Federal Circuit rejected the construction of a closed chamber "adapted to . . ." as meaning "capable of . . ." because "the closed chamber is not merely capable of being set apart from its surroundings - it is in fact set apart." *Agilent*, 567 F.3d at 1378.

In *Sta-Rite Indus., LLC v. ITT Corp.*, 682 F. Supp. 2d 738 (E.D. Tex. 2010), the court rejected "having the capacity to" as too broad a construction for "adapted to." *Sta-Rite*, 682

-28-

F.Supp.2d at 753.  The court stated that "in view of the
specification, simple capacity does not reflect the intended
meaning of 'adapted to.'"  *Id*.  Also rejecting the other party's
construction as too narrow, the court construed the term
"'adapted to' to mean 'designed or configured to.'"  *Id*.
Defendants here argue that this supports their construction of
"configured to," while Prism claims that the addition of
"designed" broadens the construction to be more akin to Prism's
preferred "capable of."

        At oral argument, Prism emphasized the fact that the
claims wherein "adapted to" appears are "system claims."  "So in
that context, it makes sense that 'adapted to forward' means
capable of forwarding, not that you have to -- you're absolutely
required to be doing that action because that doesn't make sense
in the . . . context of a system claim where you need to have
components, not particular steps" (Transcript of Proceedings -
January 12, 2012, Filing No. 468, at 108-109).  However,
Defendants refuted this argument, stating,

>               These are system claims which means
>               that when the defendants ship their
>               products, they've already got to be
>               adapted, they've already got to be
>               configured to do what the claims
>               say otherwise there's no
>               infringement.  The fact that some
>               user may later be able to adjust
>               something or make it capable of
>               doing something is irrelevant to a
>               system claim.

*Id*. at 109.

After review of the parties' submissions with respect to the term "adapted to," the Court finds that it has been "otherwise compelled" to veer from the presumption that "the same claim term in the same patent or related patents carries the same construed meaning," because "adapted to" does not mean the same thing as "capable of." However, consistent with the construction above, the Court will construe "forward" to mean "transmit." Thus, the Court construes **"adapted to forward"** as **"configured to transmit."** Accordingly,

IT IS ORDERED:  As to United States Patent No. 7,290,288,

1) As jointly stipulated by the parties (Filing No. 440), **the preambles of the asserted claims are limiting.**

2) As jointly stipulated by the parties, the following terms are construed as indicated:

a.  **"an untrusted network"** is construed to mean "a public network with no controlling organization, with the path to access the network being undefined and the user being anonymous."

b.  **"server computer"** is construed to mean "a computer that makes available information or other resources."

c.  **"Internet Protocol network"** is construed to mean "a network using any protocol of the Internet Protocol Suite including at least one of IP, TCP/IP, UDP/IP, and HTTP."

d.  **"protected resources"** and **"protected computer resources"** are construed to mean "computer services, applications, or content that can be

accessed (either directly or indirectly) by said [server computer/access server]."

e.    **"authorizing"** is construed to mean "determining whether to grant access to."

3) The Court construes the remaining disputed terms as

follows:

a.    **"digital identification"** is construed to mean "digital data whose value is known in advance or calculated at the moment."

b.    **"identity data"** is construed to mean "data sufficient for the system to determine whether a person, organization, and/or computer is authentic and/or is entitled to access protected resources."

c.    **"authenticating"** is construed to mean "determining that something is, in fact, what it purports to be."

d.    **"clearinghouse"** is construed to mean "a computer that is independent of the server computer and has software capable of storing data and controlling access to protected resources of the server computer."

e.    **"access server"** is construed to mean "server software that makes available information or other resources."

f.    **"authentication server"** is construed to mean "server software that is independent of the access server and is capable of storing data and controlling access to protected computer resources of the access server."

g.    **"selectively requiring . . . [said/the] client computer device to forward"** is construed to mean "choosing to require that the client computer device transmit certain information."

-31-

      h.    **"adapted to forward"** is construed to mean "configured to transmit."

DATED this 14th day of February, 2012.

                  BY THE COURT:

                  /s/ Lyle E. Strom

                  _____
                  LYLE E. STROM, Senior Judge
                  United States District Court